**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                        :
INDUSTRIAL MARITIME CARRIERS            :
(BAHAMAS), INC., and, INTERMARINE,      :
INC.,                                   :
          Plaintiffs,                   :          Civil Action No. 06-5625 (JAG)
                                        :
          v.                            :               **OPINION**
THOMAS MILLER (AMERICAS), INC.,         :
and, THOMAS MILLER (MIAMI), INC.,       :
                                        :
          Defendants.                   :
_____ :


**GREENAWAY, JR., U.S.D.J.**

        This matter comes before this Court on the motion by defendants, Thomas Miller

(Americas), Inc. ("TM Americas"), and Thomas Miller (Miami), Inc. ("Thomas Miller")

(collectively, "Defendants"), seeking summary judgment, pursuant to FED. R. CIV. P. 56(c),

against plaintiffs, Industrial Maritime Carriers (Bahamas), Inc. ("Maritime Carriers"), and

Intermarine, Inc. ("Intermarine") (collectively, "Plaintiffs").  For the reasons set forth below, this

motion shall be granted.[1]

_____

[1]  Defendants moved for summary judgment, on March 20, 2009, following discovery.
Docket Entry No. 22 incorrectly states that the Defendants filed a motion to dismiss the
complaint.  The document referenced at Docket Entry No. 22 is Defendants' motion for summary
judgment.
        Defendants seek the grant of summary judgment, pursuant to FED. R. CIV. P. 56(c).
Defendants, however, ask this Court to also dismiss Plaintiffs' amended complaint.  This Court
will disregard the reference to the dismissal of Plaintiffs' amended complaint and treat
Defendants' motion as one seeking the grant of summary judgment.  The resolution of a motion
for summary judgment does not lead to a dismissal of the complaint, only to the grant or denial

1

## I.  BACKGROUND

Plaintiffs controlled the operation of a ship, named the M/V Amderma ("the Amderma"), that transported cargo to Turkey.  Plaintiffs' agent released the cargo, to a company named BMG, allegedly without obtaining proper documentation from the cargo receiver.  The owner of the cargo, Daewoo Corporation ("Daewoo") sued Plaintiffs in Turkey for loss, or misdelivery, of cargo aboard the Amderma.  Daewoo also filed a lawsuit against Plaintiffs for cargo aboard another ship, the M/V Industrial Bridge ("the Industrial Bridge").  The Turkish lower court entered judgments against Plaintiffs in both cases.[2]  Following an appeal in Turkey, Plaintiffs settled with Daewoo.  Plaintiffs initiated the instant suit against Defendants, alleging that Defendants breached a duty to notify Plaintiffs of the existence of the lawsuit involving the Amderma.  Defendants handle certain maritime claims involving vessels covered by marine insurance.  The crux of Plaintiffs' complaint ("Complaint") is that as a result of Defendants' purported breach of an alleged duty to notify, Plaintiffs were unable to participate in their own defense, and that this inability to participate, unavoidably, led to an adverse judgment in Turkey.

Defendants argue that there is no genuine issue as to a material fact regarding whether such duty exists, such duty does not exist as a matter of law, and that, even if Defendants had a duty to notify Plaintiffs, the undisputed facts indicate that Defendants' action, or failure to act,

---

of summary judgment.  See Cheminor Drugs, Ltd. v. Ethyl Corp.,168 F.3d 119, 121 n.2 (3d Cir. 1999) ("[T]he grant of summary judgment and the dismissal of the complaint are inconsistent . . . .").

[2]  Plaintiffs' Complaint, however, does not include any claims, or requests for relief, regarding the Industrial Bridge judgment.  This Court, therefore, disregards claims, raised in Plaintiffs' opposition brief, for relief for the Industrial Bridge lawsuit.  This Opinion addresses the Industrial Bridge cargo, and the lawsuit in Turkey involving the Industrial Bridge, solely to explicate the facts surrounding the instant matter.

did not cause the adverse outcome.  This Court agrees.

## I.  FACTS

Plaintiff Maritime Carriers chartered the Amderma for the voyage at issue, under an agreement, or charterparty,[3] with the vessel's owner, Far Eastern Shipping Company ("FESCO"). (Defendants' R. 56.1 Statement of Material Facts ("Defs. R. 56.1 Statement") ¶ 1.)  Maritime Carriers issued a letter of indemnity to FESCO, that required that Maritime Carriers indemnify FESCO in the event that Plaintiffs delivered the Amderma's cargo to a cargo receiver without production of original bills of lading.[4]  (Id. ¶ 20.)  Maritime Carriers also chartered the M/V Industrial Bridge ("the Industrial Bridge").  (Id. ¶ 1.)  Plaintiff Intermarine is Maritime Carriers' managing agent.  (Id. ¶ 2.)  Intermarine's local agent in Turkey is Barwil Universal Denizcilik ve Tasimacilik ("Barwil").[5]  (Complaint ("Comp.") ¶ 11.)

Plaintiffs procured marine insurance for the Amderma by "entering" the ship in a mutual association.  (Defs. R. 56.1 Statement ¶ 3.)  The Amderma was entered in the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited ("the UK Club") "for protection and indemnity coverage of certain marine risks."[6]  The UK Club is a protection and indemnity

---

[3]  A charter is "[t]he leasing or hiring of an airplane, ship, or other vessel."  Black's Law Dictionary (9th ed. 2009).  A charterparty is "a special contract between the shipowner and charterer, esp. for the carriage of goods at sea."  Id.

[4]  A bill of lading is "a document that indicates the receipt of goods for shipment and that is issued by a person engaged in the business of transporting or forwarding goods."  Black's Law Dictionary (9th ed. 2009).

[5]  While Barwil is not a party to the instant suit, it was a defendant in the Turkish lawsuits.

[6]  Plaintiffs also entered the Amderma in the United Kingdom Freight, Demurrage and Defence Association Limited ("the UK Defence Club") "to insure certain legal costs."  (Defs. R.

club, or "P & I Club" in marine insurance jargon.  It is not apparent whether Daewoo's claim against Plaintiffs, for wrongful delivery of the Amderma's cargo, would have been covered under the insurance policy.[7]  (Id.)

The Industrial Bridge was not insured by the UK Club at any time before or after the subject voyages.  (Id. ¶ 6.)  Plaintiffs entered the Industrial Bridge in a German P & I Club—Trampfahrt Betriebs-Risiko-Verichertung fur Seefrachtschiffe a. G. ("Trampfahrt").  (Id.)

### Claims Handling

Defendant Thomas Miller is a claims handling company, or "correspondent" for entities

---

56.1 Statement ¶ 3.)

[7]  The UK Club's rules state that certain delivery of cargo claims will not be covered in the absence of a decision, by the UK Club, to cover the claim.  Rule 2, Section 17(D)(2)(ii) of the UK Club Rules provides, in relevant part:

> **c. Claims payable only at discretion of the Directors**
>
> Unless and to the extent that the Directors in their discretion otherwise decide there shall be no recovery from the Association in respect of liabilities, costs or expenses arising out of:
> ...
> ii. Delivery of cargo carried under a negotiable bill of lading or similar document of title without production of that bill of lading or document by the person to whom delivery was made, except where cargo has been carried on the entered ship under the terms of a non-negotiable bill of lading, waybill or other non-negotiable document, and has been properly delivered as required by that document, notwithstanding that the Owner of that entered ship may be liable under the terms of a negotiable bill of lading or other similar document of title issued by or on behalf of a party other than the Owner providing for carriage partly by a means of transport other than the entered ship . . .

(Plaintiffs' Response to Defendants Rule 56.1 Statement of Material Facts and Plaintiffs' Counterstatement of Material Facts ("Pls. Response to Defs. R. 56.1. Statement") ¶ 4 (emphasis in original).)

4

or persons that entered vessels in the UK Club.[8]  Pls. Response to Defs. R. 56.1. Statement ¶ 90.)

The person or entity that "enters" a vessel in a P & I Club becomes a "member" of the club.[9]

(Pls. Op. Br. Appendix (Excerpt of Steven L. Hazelwood, P & I Clubs: Law and Practice 14 (3d

ed. 2000)).)

     Thomas Miller's marketing materials state that Thomas Miller's role is "to properly

handle claims, appoint and instruct counsel and keep the [m]ember otherwise advised on all

development[s] in connection with the matters that [Thomas Miller] handle[s]."[10]  (Plaintiffs'

---

[8]  There are several Thomas Miller entities involved with the UK Club at different levels.
The UK Club's manager is Thomas Miller (Bermuda) Ltd.   Defendant TM Americas is the
Bermudian manager's correspondent.  (Defs. R. 56.1 Statement ¶ 7.)  Defendant Thomas Miller
is a correspondent for Defendant TM Americas.  (Id. ¶ 8.)  Defendant Thomas Miller worked
directly with Plaintiffs.
     All references in this Opinion to "Thomas Miller" refer to Defendant Thomas Miller
(Miami).  Plaintiffs have not made any specific allegations of wrongdoing by TM Americas, or
any other Thomas Miller entity.  In the event that Thomas Miller is found liable, Plaintiffs
request that this Court hold TM Americas jointly and severally liable based on a successor
liability theory.

[9]  "The relations between members and their club are generally laid down in the Articles
of Association which provide for the government of the club." (Pls. Op. Br. Appendix (Excerpt
of Steven L. Hazelwood, P & I Clubs: Law and Practice 14 (3d ed. 2000)).)

[10]  In Steven Hazelwood's treatise on P & I clubs, Hazelwood instructs that
correspondents assist members in handling claims in ports around the world:

> Members, their masters and agents, as well as the club itself, can have the benefit
> of [correspondents'] advice and local knowledge and urgent matters can be
> handled properly.
> . . .
> [Correspondents'] main responsibility is to assist members in dealing with claims
> brought or arising in overseas locations . . . .  As correspondents are not "agents"
> of the club, nor of the [club] managers, nor of the members, they are not
> authorized to accept legal process or submit to the jurisdiction.
> . . .
> The majority of club correspondents are in fact mainly commercial non-legal
> correspondents who instruct lawyers as and when necessary.

Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pls. Op. Br.") 37.)  Thomas Miller representatives testified at deposition that Thomas Miller's claims handlers should discuss claim developments with members as they occur.  (Pls. Response to Defs. R. 56.1. Statement ¶¶ 90, 93.)

Plaintiffs insist that Thomas Miller did not have a policy for "determining what information should be passed to [m]embers."  (Id. ¶ 112.)  While Defendants do not claim that such a policy exists, Defendants emphasize that a member can request to be copied on all correspondence.  (Defs. R. 56.1 Statement ¶ 112.)  Plaintiffs do not assert that they made this request to Thomas Miller.  In response to a hypothetical question raised at depositions, two of Defendants' employees testified that they would inform a member of the existence of a lawsuit.  (Pls. Response to Defs. R. 56.1. Statement ¶ 139.)  TM Americas' corporate secretary and claims manager, David Grammas, stated at deposition that forwarding a "copy of a lawsuit in which a [member] of the UK Club [was] named as a defendant" would be the "prudent thing to do."  (Id. ¶ 183.)

Thomas Miller employee, Molly McCafferty ("Ms. McCafferty") usually handled Intermarine's account.  (Defs. R. 56.1 Statement ¶ 51.)  Ms. McCafferty met with Intermarine's general counsel and claims manager, Thomas Schodowski ("Mr. Schodowski"), in person, "fairly regularly to discuss [Plaintiffs'] claims."  (Id.; Pls. Response to Defs. R. 56.1 Statement ¶ 51.)  Ms. McCafferty's assignments were covered by other Thomas Miller employees when she went on maternity leave.  (Pls. Response to Defs. R. 56.1 ¶¶ 96, 113.)  At a deposition for this lawsuit, Ms. McCafferty testified that Mr. Schodowski was a very "hands on" member regarding claims

_____

(Id. 23-25.)

6

handling and that she was not.  (Pls. Response to Defs. R. 56.1 ¶ 51.)  Ms. McCafferty testified

that she could not recall whether she informed Mr. Schodowski of the existence of the lawsuits.

(Defs. R. 56.1 ¶ 50.)

### Alleged Wrongful Delivery of Cargo

In July and August of 1997, the Amderma and the Industrial Bridge's cargo was

discharged in Turkey.  (Defs. R. 56.1 Statement ¶¶ 11, 16.)  Intermarine, pursuant to its

understanding of earlier instructions from Daewoo's agent, Centrans International Corp.

("Centrans"), directed Barwil to release the cargo without requiring the receiver of the cargo,

BMG, to deliver original bills of lading.  (Id. ¶ 21.)  Mr. Schodowski, and others at Intermarine,

and counsel for both Centrans and Daewoo exchanged faxes, regarding the cargo's release, in

May, July, and October of 1998.  (Id.¶¶ 33-35.)  One of the faxes referred to the incident as an

"alleged wrongful delivery."  (Pls. Response to Defs. R. 56.1 Statement ¶ 33.)

On July 29, 1998, Barwil received "certain [Turkish] legal papers referred to as a

'payment order,'" for the alleged misdelivery of the Industrial Bridge's cargo.  (Defs. R. 56.1

Statement ¶ 37.)  "Under Turkish law, a payment order is a demand for payment," and there is a

ten day period for raising objections.  (Id. ¶ 38.)  The payment order requested relief from

Plaintiffs, and from Barwil, individually and as Plaintiffs' agent.  (Id. ¶ 37.)  Barwil forwarded

the Industrial Bridge payment order to Intermarine.  (Id.)  Although the Industrial Bridge was not

one of the UK Club's entered vessels, Mr. Schodowski, erroneously believing the ship was

entered, notified Thomas Miller of the payment order and "asked [Thomas Miller] to engage

counsel in Turkey."  (Id. ¶ 39.)

Thomas Miller instructed its longtime correspondent in Turkey, Vitsan Istanbul

("Vitsan"), to handle the objections process and instructed Vitsan, "if necessary, to appoint a lawyer on behalf of [Plaintiffs] in order to contest the order." (Id. ¶ 41 Ex. 28.)  Vitsan notified Thomas Miller that Barwil had appointed Turkish counsel, Turgut Basacik ("Mr. Basacik"), to object to the Industrial Bridge payment order and suggested that the same lawyer raise objections to the payment order on behalf of Plaintiffs.  (Id. ¶ 42.)  Thomas Miller asked that Plaintiffs voice any concern with the appointment.  (Id. ¶ 43.)  Plaintiffs did not raise any concerns regarding counsel.  (Id. ¶ 43.)

Barwil received a similar payment order for the Amderma in August of 1998.  (Id. ¶ 45.)  Barwil forwarded this second payment order directly to Mr. Basacik, and did not forward this payment order to Plaintiffs.  (Id.)  Barwil filed timely objections to both payment orders.  (Id. ¶ 46.)

In December of 1998, approximately four months after receipt of the payment orders, and only two months after the last fax between attorneys for Daewoo and Plaintiffs, Daewoo filed lawsuits in Turkey against Barwil and Plaintiffs.  (Id. ¶ 49.)  Barwil's insurer engaged an attorney, Izzet Hatem ("Mr. Hatem"), to represent Barwil in the Turkish lawsuits, while Mr. Basacik continued to represent Plaintiffs.[11]  The facts indicate that Plaintiffs were at all times represented by counsel in both lawsuits.

---

[11] Mr. Basacik passed away in May of 2000.  (Defs. R. 56.1 Statement ¶ 66.)  Mr. Hatem testified at deposition that, prior to Mr. Basacik's passing and before Mr. Hatem was formally engaged to represent Plaintiffs, Mr. Hatem had meetings with Mr. Basacik to discuss the cases and prepare Plaintiffs' defense.  (Id. ¶ 67.)  Following Mr. Basacik's death, Barwil directed Mr. Hatem to defend Plaintiffs in both lawsuits.  (Id. ¶ 67.)  Vitsan, on behalf of Trampfahrt, engaged Mr. Hatem, to represent Plaintiffs in the Industrial Bridge suit as well.  (Id. ¶ 68.)

Plaintiffs assert that they did not become aware of the lawsuits until 2002.[12]   Plaintiffs, however, sent a telefax to an employee of the German P & I club, Trampfahrt, on March 24, 2000, that stated that the UK Club withdrew its support in relation to the Industrial Bridge lawsuit because the vessel was not entered.  (Id. ¶ 65.)  The fax stated that "the matter is still being handled by Barwil."  (Id.)  The same fax also indicated that Plaintiffs "did not wish to contact Barwil as [Plaintiffs] did not want to 'awake a sleeping dog.'"  (Pls. Response to Defs. R. 56.1 ¶ 65.)

In November of 2002, Plaintiffs received a call from individuals at Barwil requesting assistance with both lawsuits.  (Defs. R. 56.1 Statement ¶ 74.)  This call was followed by an

---

[12]   The evidence indicates that Barwil sent four faxes to Intermarine referencing the lawsuits.  (Defs. R. 56.1 Statement ¶¶ 57, 58.)  Plaintiffs admit receiving only the first two faxes. (Id. ¶¶ 69, 70.)  These two faxes did not specifically mention that Daewoo had initiated lawsuits against Plaintiffs in Turkey.  (Id.)  All faxes were sent two and a half years before the Turkish court entered judgments against Plaintiffs, and referenced both ships, unless otherwise indicated below:

•   The first, dated February 17, 1999, states that "two court cases were opened against [Barwil] in [Turkey] by Daewoo and Centrans."  In the fax, Barwil also asks whether a case was opened up against Plaintiffs.  (Id. ¶ 57.)

•   The second, dated February 23, 1999, indicates that Barwil would like Intermarine to forward the charterparties at issue.  (Id. ¶ 58.)

•   The third, dated February 25, 1999, states that "these two cases are also opened against your company as well as our side."  (Id. ¶ 59.)

•   The fourth, dated May 14, 1999, only references the Industrial Bridge voyage and states that "our/your lawyers asking for original endorsed [bills of lading] to prove to the court [that] which you stated [was] submitted to your office in Korea."  (Id. ¶ 63.)

•   The fifth, dated September 28, 2000, included references to both ships and the docket numbers for the cases, and stated that the expert panel's report was negative "from all [D]efendants['] point of view."  (Id. ¶ 69.)

9

email indicating that the lawsuits were pending against Plaintiffs and Barwil.  (Id. ¶ 75.)

Approximately six months later, on May 27, 2003, the Turkish court held a hearing on the

Amderma and Industrial Bridge lawsuits.  (Compl. ¶ 22.)  The Turkish court entered judgments

against Plaintiffs for approximately $2.9 million, plus interest from August 24, 1998.  (Id.)

        Plaintiffs argue that the attorney representing Plaintiffs failed to raise a time bar defense

that would have prevented Daewoo from obtaining a maritime lien on the Amderma.  (See Pls.

Response to Defs. R. 56.1 Statement ¶ 195.)  Plaintiffs submit an expert report on Turkish law

that provides that, under Article 1236 of the Turkish Commercial Code, Daewoo would have a

maritime lien right over the Amderma based on claims against FESCO.  (Pls. Response to Defs.

R.56.1 Statement Clyne Aff. Ex 18 (Expert Report of Ilknur Pekson, November 14, 2008 ("the

Pekson report"), at 4-8.)  The Pekson report states, however, that "the time bar for such a claim is

one year from the date of delivery" and that Daewoo filed its suit after that time period.  (Pls.

Response to Defs. R. 56.1 Statement ¶¶ 191-92.)  Plaintiffs argue that "[t]he preliminary defense

that the claim against FESCO was time barred was not raised in response to the claims filed by

Daewoo at any time."[13]  (Id. ¶ 195.)

---

        [13]  Plaintiffs also assert that the attorney representing Plaintiffs failed to raise a
jurisdictional defense based on a forum selection clause in the Industrial Bridge's bill of lading.
(Id. ¶ 188.)  The Industrial Bridge contract between Plaintiffs and Daewoo stated that it
incorporated the "terms and conditions" of the bills of lading issued by Maritime Carriers.  (Id. ¶
186.)  The Industrial Bridge bill of lading provides in relevant part:

        3. Jurisdiction
        Any dispute arising under this Bill of Lading shall be decided in the country where the carrier
        has its principal place of business and the law of such country shall apply except as provided
        elsewhere herein.

(Id.¶ 187.)  The Pekson report provides that this jurisdictional defense was not raised, and that
had it been raised, the Turkish court would have dismissed the claims against Plaintiffs and

Defendants have submitted a legal opinion on Plaintiffs' liability from a legal professional in Turkey, Prof. Dr. M. Fehmi Ülgener ("the Ülgener report").  The Ülgener report presents conclusions that contradict the Pekson report, and states that, based on the facts and applicable Turkish law, Plaintiffs would have been found liable under Turkish law, even if the defenses had been raised.   (Defs. Response to Pls. Counterstatement of Material Facts Ex. B (Ülgener Report).)

### Events Following Plaintiffs' Appeal in Turkey

Plaintiffs appealed the Amderma judgment (and the Industrial Bridge judgment), and the appellate court granted the appeal.  (Pls. Response to Defs. R. 56.1 Statement ¶ 80.)  The appellate court found, however, that it was "not possible to examine the [lower court's] judgment" as to the Amderma since the lower court discussed "proofs" relevant to the Industrial Bridge in its discussion of the Amderma.  (Id.)  During the pendency of the appeal, Plaintiffs posted a bond in the amount of $4.35 million, as required by the letter of indemnity given to FESCO, to prevent seizure of the Amderma, pursuant to the maritime lien provided to Daewoo under Turkish law.  (Id. ¶ 81.)  On October 27, 2005, Plaintiffs paid Daewoo $1.55 million to settle the litigation.[14]  (Id. ¶ 82.)

_____

FESCO.  (Id.¶ 189; Clyne Aff. Ex. 18 (Pekson report).)

[14]  On the same date, Barwil paid Plaintiffs $750,000 to settle litigation Plaintiffs had initiated against Barwil in New Orleans.  (Defs. R. 56.1 Statement  ¶ 83.)  Plaintiffs had sued Barwil for failing to advise Plaintiffs of the Turkish lawsuits and for engaging an attorney to represent Plaintiffs without authority.  (Id.)   Plaintiffs also sued Centrans and Daewoo in New Orleans, alleging that Centrans and Daewoo were liable for abuse of process because they filed the Turkish lawsuits against Plaintiffs.  (Id. ¶ 84.)  The court in New Orleans consolidated the abuse of process lawsuit with Plaintiffs' lawsuit against Barwil, and, later, dismissed the abuse of process lawsuit, with prejudice.  (Id.)

Plaintiffs filed an amended complaint in this action on September 26, 2007.[15]  Plaintiffs

bring claims for negligence (first cause of action) and breach of fiduciary duty (second cause of

action).[16]

## II.  STANDARD OF REVIEW

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party

demonstrates that there is no genuine issue of material fact and the evidence establishes the

moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986); Carrasca v. Pomeroy, 313 F.3d 828, 832-33 (3d Cir. 2002).  A factual dispute

---

[15]  Plaintiffs bring suit on the basis of diversity jurisdiction.  (Compl. ¶ 5.)  Maritime
Carriers is a Bahamian corporation with an office in New Orleans, Louisiana.  (Id. ¶ 2.)
Intermarine is a Louisiana corporation with offices at the same address as Maritime Carriers'
New Orleans office.  (Id. ¶ 2.)  TM Americas is a corporation incorporated and existing under
the laws of New Jersey, with its principal place of business located in New Jersey.  (Id. ¶ 3.)
Thomas Miller is a Florida corporation, whose principal place of business is also New Jersey.
(Id. ¶ 4.)  The amount in controversy exceeds $75,000.00.  (Id. ¶ 5.)

   The parties identify Florida, Louisiana, and New Jersey as the jurisdictions whose law
may apply to the parties' dispute.  The parties agree, however, that a true conflict does not exist
among the relevant jurisdictions, and that in the absence of a conflict, New Jersey law applies.
This Court agrees.  See Legegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006) ("If there is not an
actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a
case, a federal court sitting in diversity must do the same.").

[16]  Plaintiffs concede that their third cause of action–tortious interference with contract is
untenable.  Plaintiffs admit that New Jersey law requires intent and "that there was no intentional
interference by Defendants with Plaintiffs['] contractual relationship and, therefore, no claim lies
under New Jersey [law] . . . for tortious interference with contract."  (Pls. Op. Br. 37 n.10.)  After
a review of the record and the relevant case law, this Court agrees.  Judgment is entered on
Defendants' behalf as to Plaintiffs' third cause of action alleging tortious interference with
contract.

   Plaintiffs' fourth and final cause of action is for joint and several liability.  Plaintiffs do
not dispute Defendants' argument that if this Court grants summary judgment on Plaintiff's
substantive claims, judgment should be entered for Defendants on the fourth cause of action.
(Id.)  Defendants' assessment is correct.

is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  This Court shall "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007) (citation omitted).  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . ."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

When the moving party has the burden of proof on an issue at trial, that party has "the burden of supporting their motions 'with credible evidence . . .  that would entitle [them] to a directed verdict if not controverted at trial.'"  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331); see also United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) ("When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it . . . must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." (emphasis in original) (internal citations omitted)).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and

13

pleadings are insufficient to repel summary judgment." Schoch v. First Fid. Bancorporation, 912

F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set

forth specific facts showing that there is a genuine issue for trial").  "If the motion does not

establish the absence of a genuine factual issue, the district court should deny summary judgment

even if no opposing evidentiary matter is presented." Foster v. Morris, 208 F. App'x 174, 179 (3d

Cir. 2006).

### III.  ANALYSIS

#### A.  Negligence

In order to sustain a common law cause of action in negligence, a plaintiff must prove four

core elements: '(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual

damages.'" Polzo v. County of Essex, 960 A.2d 375, 384 (N.J. 2008)) (quoting Weinberg v.

Dinger, 524 A.2d 366, 373 (N.J. 1987)).

Plaintiffs assert that the key issue in determining Defendants' liability is "whether

Defendants' actions deprived Plaintiffs of the ability to defend themselves, as a result

guaranteeing an adverse judgment against Plaintiffs."  (Pls. Op. Br. 34.)  Plaintiffs argue that

Defendants have a duty to notify Plaintiffs of the existence of the Turkish lawsuits because

Defendants advertised their unique positioning and expertise for addressing members' claims

through a world-wide network of correspondents.  Plaintiffs also claim that the result of this

alleged breach of duty is that "no effective defense was afforded to Defendants in the Turkish

litigation . . . ."  (Pls. Op. Br. 30.)

The evidence before this Court, when viewed in the light most favorable to Plaintiffs, does

not support Plaintiffs' position that, under the circumstances, a claims handler would have had a

14

duty to inform members that a lawsuit had been filed so that the club member could participate in the defense.  Plaintiffs have identified no course of conduct, contractual provision, or UK Club rule, that would create such an expectation.  Plaintiffs also do not assert that Defendants are Plaintiffs' agents for service of process.  The statements from Defendants' marketing materials do not suggest that Defendants will notify members whenever a lawsuit is filed against them any where in the world.

Plaintiffs state that Defendants did not inform Plaintiffs of developments that arose during the course of the Turkish litigation—namely, that certain updates Vitsan faxed to Thomas Miller were not forwarded on to Plaintiffs.  Plaintiffs, however, have not based their claim for relief on any alleged failure to keep Plaintiffs apprised of developments during the litigation.  Plaintiffs claim that their injuries are due to lack of notification that the lawsuits existed.

Unfortunately, for Plaintiffs, the evidence adduced is insufficient to indicate that Defendants have a duty to inform Plaintiffs of the existence of the Amderma lawsuit.  Even the deposition testimony, that Plaintiffs highlight, from Thomas Miller employees does not aid Plaintiffs' cause.  Conflicting testimony from various individual claims handlers employed indicates that, when faced with a hypothetical scenario, an individual claims handler would determine in her discretion whether to forward a copy of a complaint to a member.  That a TM Americas executive stated that it would be "prudent" for a claims handler to forward copies of a complaint filed against a member does not mean that a duty to notify is, therefore, triggered.

What Plaintiffs lose sight of is that the best practices of the most astute claims handler hardly translates into a specific duty requiring Defendants to inform Plaintiffs that a suit has been brought against Plaintiffs.

Plaintiffs have failed to demonstrate that a reasonable juror could find that Defendants breached a duty of care.  Defendants have met their burden to show that there are no disputed issues of material fact regarding the existence of a duty to notify Plaintiffs of the existence of the Turkish lawsuits.[17]

On the other hand, even if Plaintiffs could establish a duty to notify Plaintiffs about the existence of the lawsuits, and breach of that duty, Plaintiffs still would face an insurmountable hurdle—Plaintiffs fail to raise a genuine issue as to a material fact regarding causation.[18]

Plaintiffs' causation theory depends on a speculative concatenation of events.  The link between timely notice of the Amderma suit and Plaintiffs' decision to settle the suit following a successful appeal is too attenuated.  See City of Philadelphia v. Beretta U.S.A. Corp., 277 F.3d 415, 423 (3d Cir. 2002).  "[A] plaintiff who cannot establish some direct relation between the injury asserted and the injurious conduct alleged fails to plead a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause."  Id. (internal quotation marks omitted).  Plaintiffs aim to focus this Court's attention on Defendants' alleged failure to notify Plaintiffs that Daewoo filed the Amderma lawsuit against Plaintiffs in Turkey.  The facts, however, reveal that Plaintiffs settled with Daewoo, and

_____

[17]  Defendants argue that no such duty exists because a claim relating to delivery of cargo without production of bills of lading, is not a "covered" claim.  Because the result does not depend on resolution of the extent of Plaintiffs' insurance coverage, and the parties have advised this Court that insurance coverage issues relating to the Amderma will be resolved in London arbitration, this Court need not discuss or resolve the merits of the Defendants' argument.

[18]  For purposes of this motion, this Court, making all reasonable inferences in Plaintiffs' favor, assumes that Defendants did not inform Plaintiffs that Daewoo had filed the Amderma lawsuit against Plaintiffs in Turkey, and that Plaintiffs did not, otherwise, have notice of the lawsuits until November of 2002 when Plaintiffs received a call from Barwil.

16

relinquished a post-appeal opportunity to defend themselves in the Turkish trial court, for reasons independent of Defendants' alleged failure to inform Plaintiffs.  Plaintiffs admit that the letter of indemnity Plaintiffs gave FESCO required that Plaintiffs post a bond to prevent arrest of the Amderma.  Plaintiffs decided that the cost of maintaining the bond prohibited further litigation.

Moreover, Plaintiffs have not provided any evidence that would support a conclusion that had Defendants promptly notified Plaintiffs of the Amderma lawsuit, Plaintiffs would have assisted in their own defense, and that had Plaintiffs had the opportunity to assist in their own defense, Plaintiffs would have prevailed in the lawsuits.  The parties submitted expert reports that offered contradictory conclusions on whether Plaintiffs could have avoided liability in the Turkish lawsuits.  Plaintiffs have not explained what, if any, efforts Plaintiffs made to participate in their own defense in the six months between the call from Barwil, which allegedly gave Plaintiffs the first notification of the Amderma lawsuit, and the date of the hearing in Turkey.

There is no genuine factual dispute as to whether Defendants' alleged failure to notify Plaintiffs of the existence of the lawsuits caused Plaintiffs' claimed injury.  Defendants have met their burden, at the summary judgment phase, to prove the absence of a material fact on the negligence claim, and entitlement to judgment as a matter of law.[19]

---

[19]  Plaintiffs rely on insurance cases to argue that this Court should preclude Defendants from denying a duty to handle claims involving the Industrial Bridge—or the non-entered vessel—because once Defendants took steps to defend Plaintiffs in the Turkish lawsuits, Defendants were required to handle the matter prudently.  As mentioned above, Plaintiffs failed to assert any claims against Defendants based on the handling of the Industrial Bridge lawsuit. This Court will not entertain this argument on that basis alone.  Moreover, Plaintiffs' contention is at odds with its arguments relating to the Amderma.  Plaintiffs cannot benefit from an estoppel theory that requires justifiable reliance while simultaneously denying actual or constructive knowledge of the lawsuits.

## B.  Breach of Fiduciary Duty

"A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." McKelvey v. Pierce, 800 A.2d 840, 859 (N.J. 2002) (quoting F.G. v. MacDonell, 696 A.2d 697, 703-04 (N.J. 1997)).  A fiduciary is charged with "a duty of loyalty and a duty to exercise reasonable skill and care" on behalf of the person to whose benefit the fiduciary acts. Id.  "The fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship."  Id.

Plaintiffs argue that Defendants, as claims handlers, form a special relationship with club members.  As discussed above, the facts do not suggest that the relationship between claims handlers and members, without more, requires that Defendants notify Plaintiffs when a complaint is filed.[20]

Further, the evidence does not support a finding that, under the circumstances, the scope of Defendants' alleged duty to exercise "reasonable skill and care" would include an obligation to ensure that specific defenses are raised in suits occurring around the globe.  Here, there is no dispute that Defendants appointed counsel to defend Plaintiffs, counsel raised timely objections to the payment orders, and defended Plaintiffs in the action.[21]  The evidence Plaintiffs adduce does

---

[20]  The facts indicate that Plaintiffs will give their claims handler notice of claims, and may be obligated to give their P & I club notification of pending claims.  Mr. Schodowski informed Thomas Miller of the Industrial Bridge payment order, and, later, notified both the UK Club and Trampfahrt of the existence of the Turkish suits.

[21]  Because judgment will be entered in Defendants' behalf on Plaintiffs' first three causes of action, Plaintiffs' fourth cause of action, requesting joint and several liability, is by operation of law no longer viable.  Judgment is entered in favor of the Defendants on Plaintiffs' claim for joint and several liability.

not support Plaintiffs' contention that the scope of Thomas Miller's obligations to Plaintiffs includes a duty to inform Plaintiffs that Daewoo had sued Plaintiffs in Turkey.

Defendants have met their burden to show that there are no disputed issues of material fact as to Plaintiffs' negligence and breach of fiduciary duty claims, and that Defendants are entitled to judgment as a matter of law.[22]

## IV. CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment (Docket Entry No. 22) is granted.

Date: December 29, 2009

               S/Joseph A. Greenaway, Jr.
               JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[22] Because this Court finds that Defendants were not obligated to notify Plaintiffs that a complaint had been filed against Plaintiffs in Turkey for alleged wrongful delivery of cargo aboard the Amderma, Plaintiffs claimed lack of knowledge and the extent of Thomas Miller's knowledge of the lawsuits is immaterial. This Court notes that Defendants argue that Barwil's knowledge is imputed to Plaintiffs due to his status as Plaintiffs' agent. Plaintiffs argue, in response, that the parties dispute the scope of Barwil's agency. Alternatively, Defendants also argue that Plaintiffs are unable to establish their claims because Plaintiffs' files, which would have contained correspondence between Intermarine, Thomas Miller, Barwil, and Centrans regarding the bill of lading for the Amderma was not produced with the rest of Intermarine's file on the Amderma's 1997 voyage to Turkey. (Defs. R. 56.1 Statement Ex. 31; Defs. R. 56.1 Statement ¶ 54.) Defendants also add that Intermarine's CEO, Roger Kavanagh, who maintained a daily log of all incoming and outgoing correspondence, is deceased, and his file is missing. (Id. ¶ 55.) Because this Court decides Plaintiffs' claims on other grounds, a determination on these arguments is not necessary.